Christopher Sproul (State Bar No. 126398)
Jodene Isaacs (State Bar No. 226895)
Page C. Perry (State Bar No. 246266)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376, (510) 847-3467
Facsimile: (415) 358-5695
Email:  csproul@enviroadvocates.com
Email:  jisaacs@enviroadvocates.com
Email:   page.perry@gmail.com

Fredric Evenson (State Bar No. 198059)
ECOLOGY LAW CENTER
~Monterey Bay~
P.O. Box 1000
Santa Cruz, CA 95061
Telephone: (831) 454-8216
Email: evenson@ecologylaw.com

Attorneys for Plaintiff
ECOLOGICAL RIGHTS FOUNDATION

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION,<br><br>Plaintiff,<br><br>v.<br><br>BUELLFLAT ROCK INC.,<br><br>Defendants. | Civil Case No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>DEMAND FOR JURY TRIAL<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et. seq.) |

Ecological Rights Foundation ("EcoRights"), by and through its counsel, hereby alleges:

## I.      JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. section 1251 *et seq.* (the "Clean Water Act" or the "CWA"). This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to CWA section 505(a)(1), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. section 1331 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.      On April 18, 2015, EcoRights provided notice of violations of the CWA by Defendant Buellflat Rock Inc.("Buellflat") and of EcoRights' intention to file suit against Buellflat to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region IX; the Executive Director of the California State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Region 3 ("Regional Board"); the U.S. Attorney General, and the Defendants ("Notice Letter") as required by the CWA, 33 U.S.C. § 1365(b)(1)(A). A copy of this Notice Letter is attached to this complaint as Exhibit 1.

3.      More than sixty days have passed since notice was sent to Buellflat and the state and federal agencies. Neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. No claim in this action is barred by any prior administrative action pursuant to section 309(g) of the CWA, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Central District of California pursuant to CWA section 505(c)(1), 33 U.S.C. §1365(c)(1), because the source of the violations is located within this judicial district.

## II.      INTRODUCTION

5.      This complaint seeks relief for alleged unlawful discharges of pollutants from Buellflat's facility located at 1214 Mission Drive, Solvang, California ("the Facility") into waters of the United States in violation of the Clean Water Act and the State of California's General

Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("Industrial Stormwater Permit").

6. Violations of the Clean Water Act and the Industrial Stormwater Permit by small industrial sites are recognized as a leading cause of significant, cumulative impacts to the water quality of the Santa Ynez River. With every rainfall event, large quantities of polluted rainwater flow off of industrial, commercial, and urbanized lands and pour into storm drains and into the river. The consensus among agencies and water quality specialists is that stormwater pollution accounts for more than half of the total pollution entering the California's receiving waters each year.

7. Stormwater runs off of industrial sites such as Buellflat's, causing harm to humans and aquatic life. In particular, stormwater from such industrial facilities contains suspended sediment, pathogens and chemicals that are potentially significant to the beneficial uses of the Santa Ynez River. Industrial facilities such as Buellflat in the Santa Ynez River watershed have been identified as a potential source of sediment during major storm events, reportedly caused by the failure of on-site settling/retention ponds to contain event stormwater runoff. The sediments of the Santa Ynez River and its tributaries act as a sink for bioaccumulative deposits of heavy metals, and strong winds and tidal currents continually re-suspend and redeposit these metals. Toxic chemicals are concentrated in the River's food web as toxic metals and other contaminants absorbed by plankton are consumed by shellfish, fish and birds farther up the food chain, and eventually by humans. Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological and reproductive effects. Fish are widely used to evaluate the health of aquatic systems because pollutants accumulate in fish, which are an important part of aquatic food chains. Heavy metals have been shown to alter physiological activity in tissues and blood of fish.

8. High concentrations of total suspended solids ("TSS") degrades optical water quality by reducing water clarity and decreasing light available to support photosynthesis. Suspended solids have been shown to alter predator-prey relationships (for example turbid water might make it difficult for fish to see their prey). Deposited solids alter habitat for fish, aquatic

plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and PAHs, are adsorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments.

9.     Buellflat's stormwater discharges contribute to the ongoing stormwater pollution problem and exemplify the epidemic of violations of industrial stormwater permits that EcoRights is seeking to eliminate or reduce. These pollution discharges can and must be curtailed for the Santa Ynez River to be restored to ecological health.

**III.     <u>PARTIES</u>**

10.     EcoRights is a non-profit public benefit corporation organized under the laws of California, with its main office in Garberville, California. EcoRights' purpose is to educate the public about environmental practices which cause harm to human health, the environment and other natural resources, and to seek redress from those harms through litigation or alternative dispute resolution. EcoRights represents citizens in protecting California's waterways from pollution, securing the multitude of benefits that flow from clean, vibrant waters: safe drinking water, abundant and diverse wildlife populations, healthy recreational opportunities, and economic prosperity from commercial fishing, tourism, and other commercial activities that depend on clean water. To further its goals, EcoRights actively seeks federal and state agency implementation of state and federal water quality laws, including the CWA, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

11.     Members of EcoRights, including citizens, taxpayers, property owners, and residents, live, work, travel and recreate near the Santa Ynez River (hereinafter collectively referred to as "impacted waters"), into which Buellflat causes pollutants to be discharged. These EcoRights members use and enjoy the impacted waters for recreational, educational, scientific, conservation, aesthetic, and spiritual purposes. Buellflat's alleged discharge of stormwater containing pollutants impairs each of those uses. Thus, the interests of EcoRights' members have been, are being, and will continue to be adversely affected by Buellflat's failure to comply with the Clean Water Act and the Industrial Stormwater Permit.

12.     Defendant Buellflat Rock Inc. is a privately-held company with a single location.

Buellflat staff who are located at the facility at 1214 Mission Drive, Solvang, California submit most reporting required under the Industrial Stormwater Permit.

13.     Buellflat operates the Buellflat Facility where it conducts bulk aggregate storage, sorting, washing, offloading, and sales activities adjacent to the Santa Ynez River.

**IV.     REGULATORY BACKGROUND**

**Clean Water Act**

14.     CWA section 301(a), 33 U.S.C. §1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge is in compliance with various enumerated CWA sections. Among other things, CWA section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

15.     CWA section 402(p) requires that NPDES permits be issued for stormwater discharges associated with industrial activities.

16.     CWA section 402(b) allows each state to administer its own EPA-approved permit program for discharges. In California, the State Board and its nine Regional Boards have approval from EPA to administer an NPDES permit program for the State. The State Board and its nine Regional Boards issue individual and general NPDES permits regulating water pollutant discharges from various categories of dischargers.

17.     CWA section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1); *see* 33 U.S.C. § 1362(5).

18.     CWA section 505(a) authorizes a citizen suit action for injunctive relief. 33 U.S.C. § 1365(a). CWA violators are also subject to an assessment of civil penalties of up to $32,500 for all violations occurring on or after March 15, 2004 through January 12, 2009, and $37,500 per day per violation for violations occurring after January 12, 2009. CWA § 309(d), 33 U.S.C. § 1319(d) and 40 C.F.R. §§ 19.1 - 19.4.

**State Regulations**

19.     The Santa Ynez River is heavily degraded from pollutant loading. This is officially recognized by the EPA, the State Board and the Regional Board, which have placed the Santa Ynez River on the CWA section 303(d) list of waters that are so polluted that they do not meet applicable water quality standards. The Regional Board's Basin Plan is the master policy document setting forth the legal, technical, and programmatic bases of water quality regulation in the Region. Among other things, the Basin Plan includes the water quality objectives needed to protect the designated beneficial water uses. The Basin Plan sets forth narrative water quality objectives for sediment, settleable matter, and suspended materials, as well as narrative objectives for not impairing water quality with oil sheens, turbidity, or other nuisance conditions. The Basin Plan also includes numeric water quality standards for pH, dissolved oxygen and toxic pollutants as well as site specific objectives for certain pollutants of concern such as copper, lead, and zinc.

20.     In addition, a rule promulgated by EPA known as the California Toxics Rule ("CTR") sets Water Quality Standards ("WQS") for 126 toxic priority pollutants in California's rivers, lakes, enclosed bays, and estuaries. The CTR, which applies to the Santa Ynez River, includes limits for several toxic metals.

**The General Industrial Stormwater Permit**

21.     In California, the State Board has elected to issue a single, statewide general permit applicable to all stormwater discharges associated with industrial activity. The Industrial Stormwater Permit is an NPDES permit pursuant to CWA section 402(p), 33 U.S.C. § 1342(p). To discharge stormwater lawfully in California, industrial dischargers must secure coverage under the Industrial Stormwater Permit and comply with its terms or obtain and comply with an individual NPDES permit.

22.     The Industrial Stormwater Permit contains certain absolute prohibitions. Discharge Prohibition A(1) of the Industrial Stormwater Permit prohibits the direct or indirect discharge of materials other than stormwater ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. Discharge Prohibition ¶ A.2 of the Industrial Stormwater Permit prohibits stormwater discharges that cause or

threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation ¶ C.1 of the Industrial Stormwater Permit prohibits discharges that adversely impact human health or the environment. Receiving Water Limitation ¶ C.2 of the Industrial Stormwater Permit prohibits discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

23.    In addition to absolute prohibitions, the Industrial Stormwater Permit contains a variety of substantive and procedural provisions with which dischargers must comply. At a minimum, dischargers must employ measures to reduce or eliminate stormwater pollution that constitute the Best Available Technology Economically Achievable ("BAT") and the Best Conventional Pollutant Control Technology ("BCT"). Industrial Stormwater Permit, Effluent Limitation B.3.

24.    Dischargers must develop and implement a Stormwater Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. *Id.* at ¶ A(1) and Provision § E.2. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and authorized non-stormwater discharges from the facility. *Id.* at ¶ A.2. The SWPPP must identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges. *Id.* The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. *Id.*, Effluent Limitation ¶ B.3.

25.    The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution generating activities, nearby water bodies, and pollutant control measures; a description of stormwater management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received,

and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. *Id.* at ¶¶ A.1-A.10.

26.     The Industrial Stormwater Permit also requires facility operators to properly operate and maintain any facilities and systems of treatment and control installed or used to achieve compliance with the conditions of the Industrial Stormwater Permit and requirements of the SWPPP at all times. Industrial Stormwater Permit, § C. The SWPPP and site maps must be assessed annually and revised as necessary to insure accuracy and effectiveness. *Id.* at ¶¶ A.1, B.3, and 4.

27.     Facility operators are required to develop and implement a monitoring and reporting program ("MRP") when industrial activities begin at a facility. *Id.* at ¶ B.1 and Provision ¶ E.3. The MRP must ensure that stormwater discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Industrial Stormwater Permit. *Id.* at ¶ B.2. The MRP must ensure that practices at the facility to prevent or reduce pollutants in stormwater and authorized non-stormwater discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

28.     Pursuant to the monitoring and reporting requirements of the Industrial Stormwater Permit, facility operators must conduct ongoing visual observations of stormwater and non-stormwater discharges and record responsive measures taken to eliminate unauthorized non-stormwater and to reduce or prevent pollutants in stormwater and authorized non-stormwater discharges. *Id.* at ¶¶ B.3, 4. Facility operators must collect samples of stormwater discharges from *all* locations where stormwater may be discharged from the facility. *Id.* at ¶¶ B.5, 7. Facility operators must submit Annual Reports to the Regional Board accurately reporting their monitoring activity. *Id.* § B: MRP Requirements, ¶ 14 & § C: Standard Provisions, ¶¶ 9 and 10.

## V.     STATEMENT OF FACTS

29.     Along the central coast of California, stormwater drains untreated either directly, or through the storm drain system, into the Pacific Ocean and its tributaries. Among those who

1    specialize in the field of water quality locally, it is well known and commonly understood that

2    stormwater pollution accounts for the majority of pollution entering the state's receiving waters

3    each year.

4          30.    Buellflat operates a bulk aggregate storage, sorting, washing, offloading, and sales

5    facility located off Mission Drive in Solvang, Santa Barbara County, California.

6          31.    Activities at the Facility include the storing and sales of aggregates, including

7    maintaining large piles of various types of crushed stone throughout the site. Discharges of

8    stormwater flow off the Facility at two different discharge points and flows directly into the Santa

9    Ynez River.

10         32.    The operations at the Facility occur outdoors and are causing pollutants to be

11   exposed to rainfall. At the Facility, the industrial materials are stored outdoors in large piles open

12   to wind and storm water flows. Bulk aggregate facilities such as Buellflat generate large amounts

13   of dust and particulate matter which settle on the ground and other surfaces which are exposed to

14   storm water and non-storm water flows. The Facility lacks sufficient and/or sufficiently well-

15   maintained berms or other structural controls to retain stormwater and non-stormwater on the

16   Facility. Buellflat does not sufficiently treat contaminated stormwater prior to discharge from the

17   Facility. The large number of trucks entering and leaving the Facility track dirt, metals, and other

18   pollutants off-site and onto Mission Drive where rainfall washes these pollutants into the storm

19   drain system or directly into waters of the United States.

20         33.    The types of pollutants that the Facility releases into the immediate environment

21   include, among others: nitrate, copper, and zinc; and total suspended solids ("TSS"). The industrial

22   materials stored, and the pollutants generated, at the Facilities are exposed to stormwater flows.

23         34.    Most, if not all, of the Facility is unpaved. Thus, pollutants from Buellflat's

24   activities can soak into unpaved ground and later become mobilized in stormwater flows.

25   **Buellflat Activities Contributing to CWA Violations**

26         35.    Buellflat has not developed and/or implemented an adequate SWPPP at the

27   Facility.

28         36.    Buellflat has not implemented BMPs that adequately minimizes the exposure of

pollutants at the Facility to stormwater.

37.     Buellflat has not implemented BMPs at the Facility that adequately control and minimize contaminated runoff from the facility.

38.     Buellflat has not implemented BMPs at the Facility that adequately treat and remove pollutants in stormwater prior to discharge.

39.     Buellflat has not adequately evaluated and revised its SWPPP for the Facility to address these failures. Buellflat has also failed to fully implement its SWPPP and properly operate and maintain the structures and systems that have been put in place to achieve compliance with the Industrial Stormwater Permit and SWPPP requirements.

40.     Buellflat has not developed and/or implemented an adequate MRP at the Facility.

41.     Buellflat's monitoring and reporting activities have not resulted in practices that adequately reduce or prevent pollutants from discharging into stormwater flows from the Facility.

42.     Buellflat has failed to complete all of the visual observations and stormwater sampling required by the Industrial Stormwater Permit at the Facility.

43.     Buellflat's monitoring activities have not effectively identified compliance problems at the Facility or resulted in effective revision of its SWPPP.

44.     Due to Buellflat's lack of effective pollution prevention measures, its failure to implement effective best management practices, and its failure to implement an effective monitoring and reporting program, stormwater and non-stormwater from the Facility becomes polluted with many constituents. Dust, sand, toxic metals such as nitrates, copper and zinc; and TSS become entrained in stormwater and non-stormwater when such water flows over and across the outdoor processing areas of the Facilities. This polluted water is discharged to the Santa Ynez River, which then flows into the Pacific Ocean.

45.     Buellflat's own stormwater sampling indicates that Buellflat's discharges of stormwater from the Facility is consistently contaminated with higher levels of pollutants than is permissible under the Industrial Stormwater Permit.

## VI.   CLAIMS

### FIRST CLAIM FOR RELIEF

**Discharges of in Violation of Technology-Based Effluent Limitations
(Violations of 33 U.S.C. § 1311)**

46.     Plaintiffs incorporate the allegations contained in all preceding paragraphs as though fully set forth herein.

47.     The CWA provides that "the discharge of any pollutant by any person shall be unlawful" unless the discharger is in compliance with the terms of a NPDES permit. CWA § 301(a), 33 U.S.C. § 1311(a); *see also* CWA § 402(p), 33 U.S.C. § 1342(p) (requiring NPDES permit issuance for the discharge of stormwater associated with industrial activities). The Facility discharges stormwater associated with industrial activity to the Santa Ynez River, which is contaminated with pollutants. The Facility discharges stormwater pursuant to the Industrial Stormwater Permit, which authorizes these discharges conditioned on the Facility complying with the terms of the Industrial Stormwater Permit. Each of these permit terms constitutes an "effluent limitation" within the meaning of CWA section 505(f), 33 U.S.C. § 1365(f). The Facility's stormwater discharges have violated numerous of these permit terms, thereby violating CWA effluent limitations.

48.     The Effluent Limitations of the Industrial Stormwater Permit, ¶ B.3, prohibit the Facility from discharging pollutants above the level commensurate with the application of BAT and BCT. On every day the Facility has existed since at least March 30, 1992, Buellflat has been discharging polluted stormwater from the Facility containing levels of pollutants above the level commensurate with the application of BAT and BCT in violation of the Effluent Limitations, ¶ B.3, of the Industrial Stormwater Permit during every significant rain event (defined by the United States Environmental Protection Agency as a rainfall event generating 0.1 inches or more of rain). Significant local rain events are reflected in the rain gauge data available at http://cdec.water.ca.gov and http://lwf.ncdc.noaa.gov/oa/ncdc.html. Attached as Attachment 2 to Exhibit 1 is a table reflecting the rainfall data for the past five years, as reported to the Cachuma Lake Station, the closest monitoring station available on the NOAA website.

49.     EPA and the State Board have published Benchmark Values set at the maximum

level of pollutant loading generally expected if an industrial facility is employing BAT and BCT (which are set forth in Attachment 1 to Exhibit1). As reflected in Attachment 1 to Exhibit 1, the Facility has repeatedly discharged stormwater from each of the discharge locations identified in Defendants' Annual Reports containing pollutant levels exceeding Benchmark Values, which establishes that the Facility has discharged pollutants above a level commensurate with application of BAT and BCT. Attachment 1 compiles some of the self-monitoring data reported by the Facility to the Regional Board reflecting the Facility's sampling of actual stormwater discharges, as well as samples taken by others from the Facility. The sample results reflected in Attachment 1 are representative of the pollutant levels in the Facility's discharge of stormwater, including such discharges that Buellflat did not sample or analyze. Thus, every instance when the Facility has discharged stormwater, including instances when the Facility has discharged stormwater that it has not sampled, this stormwater discharge has contained levels of pollutants comparable to the levels set forth in Attachment 1. Such polluted stormwater discharges from the Facility have occurred during every significant rain event that the Facility has existed since at least March 30, 1992.

50.     EcoRights further alleges that on each day that Buellflat has discharged stormwater, Buellflat has discharged stormwater that was not treated to a level commensurate with BAT or BCT in violation of the Effluent Limitations of the Industrial Stormwater Permit, ¶ B.3., because, as further alleged in the Third Claim, below, Buellflat has not developed and implemented a SWPPP that mandates BMPs that are commensurate with BAT and BCT for the Facility.

51.     Unlawful discharges of stormwater from the Facility with levels of pollutants exceeding BAT and BCT levels of control continue to occur presently and will occur in the future during all significant rain events.

52.     Each discharge of stormwater from the Facility after the effective date of the Industrial Stormwater Permit has constituted and will constitute a separate violation of the Industrial Stormwater Permit's Effluent Limitations and the CWA. Every day since at least five years and sixty days before the date Plaintiff filed this Complaint that Buellflat has discharged or will discharge polluted stormwater from the Facility in violation of the Effluent Limitations of the

1   Industrial Stormwater Permit, ¶ B.3 is a separate and distinct violation of CWA section 301(a), 33

2   U.S.C. § 1311(a) which subjects Buellflat to an assessment of civil penalties pursuant to CWA

3   sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

### SECOND CLAIM FOR RELIEF

**Discharges of in Violation of Water Quality-Based Effluent Limitations**
**(Violations of 33 U.S.C. § 1311)**

7   53.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as

8   though fully set forth herein.

9   54.    The Discharge Prohibitions of the Industrial Stormwater Permit, ¶ A.2, prohibit

10   stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance. The

11   Discharge Prohibitions of the Industrial Stormwater Permit, ¶ A.2, prohibit stormwater discharges

12   to surface or groundwater that adversely impact human health or the environment. The Receiving

13   Water Limitations of the Industrial Stormwater Permit, ¶ C.2, prohibit stormwater discharges that

14   cause or contribute to an exceedance of applicable Water Quality Standards. Applicable Water

15   Quality Standards are set forth in the Basin Plan[1] and the California Toxics Rule[2] ("CTR").

16   55.    The Basin Plan, *inter alia*, establishes the following Water Quality Standards for

17   the Santa Ynez River:

18       (a) Controllable water quality shall conform to the water quality objectives

19           contained therein. Basin Plan at III-2.

20       (b) Dissolved oxygen levels shall be a minimum of 5.0 mg/L [5,000 ug/L]. *Id*. at

21           III-4.

22       (c) Suspended sediment shall not be discharged at rates that cause nuisance or

23           adversely affect beneficial uses. *Id*. at III-3.

---

[1] The Basin Plan is published by EPA on the internet at:
http://www.epa.gov/waterscience/standards/wqslibrary/ca/ca_9_san_francisco.pdf
The Basin Plan is also published by the Regional Board on the internet at:
http://www.swrcb.ca.gov/rwqcb2/basinplan.htm

[2] The CTR is set forth at 40 C.F.R. § 131.38 and is explained in the Federal Register preamble
accompanying the CTR promulgation set forth at 65 Fed. Reg. 31682

(d) Waters shall not contain settleable material in concentrations that result in deposition of material that causes nuisance or adversely affects beneficial uses. *Id*.

(e) Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses. *Id*.

(f) Waters shall not contain oils, greases, waxes, or other similar materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses. *Id*.

56.     The Basin Plan further establishes numeric water quality criteria for zinc.

57.     Buellflat's discharges of stormwater from the Facility from each of the two discharge locations ("outfalls") identified in Buellflat's Annual Reports have caused or contributed to an exceedance of one or more of the above-listed Water Quality Standards. Attachment 1 to Exhibit 1 compiles some of the self-monitoring data reported by the Facility to the Regional Board reflecting the Facility's sampling of stormwater discharges. The sample results reflected in Attachment 1 are representative of the pollutant levels in the Facility's discharge of stormwater, including such discharges that Buellflat did not sample or analyze. Thus, every instance when the Facility has discharged stormwater, including instances when the Facility has discharged stormwater that Buellflat has not sampled, this stormwater discharge has contained levels of pollutants comparable to the levels set forth in Attachment 1. Attachment 1 indicates that the Facility routinely discharges stormwater to the Santa Ynez River containing, *inter alia*, the following pollutants: nitrates, cadmium, chromium, copper, nickel, lead, zinc, specific conductance (EC), and total suspended solids (TSS). The levels of these pollutants in the Facility's stormwater discharges have caused pollution, contamination, or nuisance in violation of the Discharge Prohibitions of the Industrial Stormwater Permit, ¶ A.2 and have adversely impacted the environment in violation of the Receiving Water Limitations of the Industrial Stormwater Permit, ¶ C.1. Moreover, the discharge of these pollutants has caused the Santa Ynez River not to attain or contributed to these waters not attaining one or more applicable Water

Quality Standards in violation of the Receiving Water Limitations of the Industrial Stormwater Permit, ¶ C.1.

58.     Specifically, the Facility's discharge of excessive TSS has caused or contributed to the Santa Ynez River not meeting applicable Water Quality Standards in the Basin Plan for levels of suspended sediment and turbidity. The Facility's discharge of stormwater containing suspended and settleable toxic metals and other materials has contributed to the deposition and/or dispersal of materials that interfere with beneficial uses of the Santa Ynez River and a detrimental increase in concentrations of toxic substances found in bottom sediments or aquatic life due to bioaccumulation. The Facility's discharge of zinc has caused the Santa Ynez River to exceed Water Quality Criteria established by the Basin Plan for these pollutants.

59.     EcoRights alleges and puts Buellflat on notice that each day that Buellflat discharged stormwater from the Facility, Buellflat's stormwater contained levels of pollutants matching the levels set forth in Attachment 1 to Exhibit 1 and thus caused levels of pollutants to exceed one or more of the applicable Water Quality Standards in the Santa Ynez River. Every day that the Facility has been in existence since the effective date of the above-referenced Water Quality Standards, which date back at least to 1986 in most instances, and to May 24, 2000 for the California Toxics Rule's limit on cadmium, copper, and zinc, Buellflat has discharged stormwater from the Facility during at least every significant local rain event over 0.1 inches that has caused or contributed to Water Quality Standards not being met in the Santa Ynez River. Significant local rain events are reflected in the rain gauge data available at http://cdec.water.ca.gov and http://lwf.ncdc.noaa.gov/oa/ncdc.html, and, as mentioned above, summarized in Attachment 2.

60.     The Stormwater discharges referred to in the preceding paragraphs further violate the Discharge Prohibitions of the Industrial Stormwater Permit, ¶ A.2, in that these discharges cause or threaten to cause pollution, contamination, or nuisance and further adversely impact human health and environment by polluting the Santa Ynez River with toxic metals and wastewater high in turbidity.

61.     Buellflat's unlawful discharges from the Facility continue to occur presently and

will occur in the future during all significant rain events. Each discharge of stormwater from the Facility after the effective date of the Industrial Stormwater Permit has constituted and will constitute a separate violation of the Discharge Prohibitions of the Industrial Stormwater Permit, ¶ A.2, and/or the Receiving Water Limitations of the Industrial Stormwater Permit, ¶ C.2, and the CWA. Every day since at least five years and sixty days before the date Plaintiff filed this Complaint that Buellflat has discharged or will discharge polluted stormwater from the Facility in violation of Discharge Prohibitions of the Industrial Stormwater Permit, ¶ A.2 and/or the Receiving Water Limitations of the Industrial Stormwater Permit, ¶ C.2 is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Buellflat to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

## THIRD CLAIM FOR RELIEF

### Failure to Develop and Implement an Adequate Stormwater Pollution Prevention Plan
### (Violations of 33 U.S.C. § 1311)

62.     Plaintiffs incorporate the allegations contained in all preceding paragraphs as though fully set forth herein.

63.     Buellflat has failed to develop and implement an adequate SWPPP or implement all necessary revisions to the SWPPP for the Facility as required by ¶¶ A.1, A.2, and A.9 of the Industrial Stormwater Permit.

64.     Buellflat has failed to prepare, maintain, revise and implement Buellflat's SWPPP as required, as evidenced by stormwater discharges that exceed EPA and State benchmarks and contribute to violations of Water Quality Standards in receiving waters. Buellflat's SWPPP does not specify adequate BMPs designed to reduce pollutant discharge to BAT and BCT levels in accord with Section A: SWPPP Requirements, ¶ 8 of the Industrial Stormwater Permit as evidenced by the Facility's continued discharge of stormwater contaminated above pollutant levels attainable via application of BAT and BCT. For example, all of the following BMP measures (note, this is an illustrative, not exhaustive list) are technologically feasible, constitute BAT and BCT for the Facility, and would greatly decrease Buellflat's discharges of contaminated stormwater: (1)Install dikes, curbs, and berms to divert or prevent stormwater from discharging; (2) Help reduce the

sediment and pollutant load of stormwater discharged by installing gabions, riprap, native rock retaining walls, straw bale barriers, sediment traps/catch basins, biotechnical stabilization, silt fences, siltation berms, brush sediment barriers and vegetated buffer strips for sediment control and collection; (3) Conduct vehicle and equipment maintenance in covered areas.

65.     Buellflat's failures to draft an adequate SWPPP, and/or to revise, and/or to implement Buellflat's SWPPP in all the above respects are in violation of the requirements of Section A of the Industrial Stormwater Permit. Buellflat was required to have prepared and implemented an adequate SWPPP by no later than October 1, 1992 pursuant to the previous Industrial Stormwater Permit issued by the State Board and by Section A: Stormwater Pollution Prevention Plan Requirements, ¶ 1 of the current Industrial Stormwater Permit. Therefore, Buellflat has been in daily and continuous violation of the Industrial Stormwater Permit's requirement to develop and implement an adequate SWPPP for the Facility on each and every day since October 1, 1992 that Buellflat has maintained the Facility. Buellflat will continue to be in violation every day that Buellflat fails to develop and implement an adequate SWPPP.

66.     Every day since at least five years and sixty days before the date Plaintiff filed this Complaint that Buellflat has failed to draft an adequate SWPPP, and/or to revise, and/or to implement Buellflat's SWPPP in violation of the requirements of Section A of the Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Buellflat to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

## FOURTH CLAIM FOR RELIEF

**Failure to Develop and Implement an Adequate
Monitoring and Reporting Program
(Violations of 33 U.S.C. § 1311)**

67.     Plaintiffs incorporate the allegations contained in all preceding paragraphs as though fully set forth herein.

68.     Buellflat has failed to develop and implement an adequate monitoring and reporting program ("MRP") and implement all necessary revisions to the MRP at the Facility as required by Section B and Provision ¶ E.3 of the Industrial Stormwater Permit.

69.     Buellflat's MRP must provide for collection of stormwater samples from the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season. Section B: MRP Requirements, ¶ 5. Buellflat's MRP must further direct Buellflat to take and analyze samples from each discharge point at the Facility. *Id*. at ¶¶ 5, 7.a.

70.     Buellflat's Annual Reports submitted to the Regional Board for the Facility indicate that Buellflat has not consistently and/or properly taken and analyzed the required samples. For 2012-2013 and 2013-2014 water years, Buellflat did not collect or analyze a single stormwater sample at all. This is a violation of the requirement to sample two storm events in a year.

71.     Buellflat's MRP must provide for analysis of toxic chemicals and other pollutants that are likely to be present in its stormwater discharges. Industrial Stormwater Permit, Section B: MRP Requirements, ¶ 5. Sampling conducted by EcoRights has shown that Buellflat's stormwater discharges contain elevated copper, chromium, lead, mercury, nickel, and zinc. In addition, any party operating in Your industry doing their due diligence would know that stormwater from a Facility such as Yours would have elevated metals. Your MRP is inadequate because it fails to provide for analysis of additional metal pollutants common to the aggregate industry.

72.     Buellflat has failed to implement Buellflat's MRP and/or an MRP that would be compliant with the Stormwater Industrial Permit because Buellflat has not analyzed all of the pollutant parameters listed in the preceding paragraph in each of the stormwater runoff events from the Facility that Buellflat was required to take samples of. Specifically, Buellflat failed to analyze Buellflat's stormwater discharges from each of the 2 outfalls for cadmium, copper and zinc in the stormwater samples Buellflat has taken in every year since at least 2008.

73.     As alleged in the preceding paragraphs, Buellflat has not developed and implemented an adequate MRP. Buellflat was required to have prepared and implemented an adequate MRP by no later than October 1, 1992 pursuant to the previous Industrial Stormwater Permit issued by the State Board and by Section B: Monitoring Program and Reporting Requirements, ¶ 1.a. of the current Industrial Stormwater Permit. Therefore, Buellflat has been in daily and continuous violation of the monitoring and reporting requirements of the Industrial

1  Stormwater Permit set forth in Section B: MRP Requirements every day since October 1, 1992.

2  Buellflat will continue to be in violation every day that Buellflat fails to develop and implement

3  an adequate MRP for the Facility.

4  74.    As further discussed above, Buellflat has not submitted accurate and complete

5  Annual Reports and reports of Buellflat's noncompliance with the Industrial Stormwater Permit.

6  Therefore, Buellflat has been in daily and continuous violation of the reporting requirements of

7  the Industrial Stormwater Permit, Section B: MRP Requirements, ¶ 14 and Section C: Standard

8  Provisions, ¶¶ 9 and 10 every day since each of Buellflat's Annual Reports were due.

9  75.    Every day since at least five years and sixty days before the date Plaintiff filed

10 this Complaint that Buellflat has failed to prepare and implement an adequate MRP as required by

11 Section B: Monitoring Program and Reporting Requirements or comply with the reporting

12 requirements of the Industrial Stormwater Permit, Section B: MRP Requirements, ¶ 14 and

13 Section C: Standard Provisions, ¶¶ 9 and 10 is a separate and distinct violation of CWA section

14 301(a), 33 U.S.C. § 1311(a) which subjects Buellflat to an assessment of civil penalties pursuant

15 to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

16 76.    An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. §

17 1365(a). Continuing commission of the acts and omissions alleged in Plaintiff's First through

18 Fourth Claims above will irreparably harm Plaintiff and Plaintiff's members, for which harm they

19 have no plain, speedy, or adequate remedy at law.

20 Wherefore, Plaintiff prays judgment against Buellflat as set forth hereafter.

21 **VII.    RELIEF REQUESTED**

22 77.    Wherefore, EcoRights respectfully requests this Court to grant the following

23 relief:

24 a.    Declare Defendants to have violated and to be in violation of CWA section

25 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from its the Facility in violation of a

26 permit issued pursuant to CWA section 402, 33 U.S.C. § 1342 and for failing to comply with all

27 substantive and procedural requirements of the Industrial Stormwater Permit and the CWA;

28 b.    Enjoin Defendants from discharging pollutants from its Facility to the Santa

Complaint                                    Page 18

1   Ynez River;

2       c.      Enjoin Defendants to restore all receiving waters damaged by Defendant's illegal

3   discharges of pollutants from the Facility;

4       d.      Enjoin Defendants from violating the substantive and procedural requirements of

5   the Industrial Stormwater Permit at the Facility;

6       e.      Order Defendants to pay civil penalties of up $37,500 per day in accord with

7   CWA Section 309(d), 33 U.S.C. § 1319(d) and 40 C.F.R. §§ 19.1 - 19.4 (2009).

8       f.      Award Plaintiff its costs (including reasonable attorney, witness, and consultant

9   fees) as authorized by the CWA, 33 U.S.C. § 1365(d); and

10      g.      Award such other relief as this Court may deem appropriate.

11  **VIII.**   **DEMAND FOR JURY**

12          Pursuant to Federal Rule of Civil Procedure 38(b), EcoRights demands a jury trial in this

13  matter.

14  **IX.**   **DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS**

15          Based on EcoRights' knowledge to date, pursuant to Civil Local Rule 3-16, the

16  undersigned certifies that, as of this date, other than the named parties, there is no such interest to

17  report.

18

19  Dated: June 19, 2015                    ENVIRONMENTAL ADVOCATES

20

21                                          _____

22                                          Page Perry, Attorney for Plaintiff
                                            ECOLOGICAL RIGHTS FOUNDATION

23

24

25

26

27

28